**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA and
STATE OF MICHIGAN, ex rel,
MICHAEL NOBLE, an individual,

Plaintiff-Relator,

-vs-

CIENA HEALTH CARE MANAGEMENT, INC.
a Michigan corporation; REGENCY ON THE LAKE-FORT GRATIOT, LLC, d/b/a REGENCY ON THE LAKE-FORT GRATIOT; REGENCY ON THE LAKE REAL ESTATE-FORT GRATIOT, LLC, MOHAMMAD A. QAZI and SELECT REHABILITATION MANAGEMENT SERVICES, a Delaware Corporation,
Jointly and Severally,

Defendants.
__________________________________________/

Civil Action No. 10-
Hon.
Magistrate

**MATTER FILED IN CAMERA AND UNDER SEAL**

HERTZ SCHRAM PC
By: Patricia A. Stamler (P35905)
Attorneys for Plaintiff-Relator Noble
1760 S. Telegraph Road, Suite 300
Bloomfield Hills, MI 48302
(248) 335-5000
__________________________________________/

**COMPLAINT AND JURY DEMAND**

NOW COMES Relator Michael Noble (hereafter "Relator"), pursuant to 31 U.S.C. § 3729 et seq., and the Michigan Medicaid False Claims Act, MCL 400.601, et seq., by and through his counsel HERTZ SCHRAM PC, hereby files this Complaint under the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*; the False Claims Recovery Act of 2009 ("FERA"), 31 U.S.C. §§ 3729-3733; the Civil Monetary Penalties Law ("CMPL"), 42 U.S.C. §§ 1320a-7(b)(7)

and 1320a-7a; and the Michigan Medicaid False Claims Act ("MFCA"), M.C.L. 400.601 *et seq.* (collectively, the "Acts") and states as follows:

**SEALED COMPLAINT**

1. Under the FCA, this complaint is to be filed *in camera* and remain under seal for a period of at least sixty (60) days. 31 U.S.C. § 3730(b) (2).

2. Under the MFCA the complaint is to be filed in-camera and remain under seal for a period of at least ninety (90) days. M.C.L. 400.610a.

3. The complaint shall not be served on Defendants until the Court so orders following the intervention periods by the federal and state governments. 31 U.S.C. § 3730(b)(2); M.C.L. 400.610a(2).

4. The federal government may elect to intervene and proceed with the action within sixty (60) days after it receives both the Complaint and the material evidence disclosure. 31 U.S.C. § 3730(b)(2).

5. The state government may elect to intervene and proceed with the action within ninety (90) days after it receives both the Complaint and the evidentiary disclosure. M.C.L. 400.610a (3).

**JURISDICTION AND VENUE**

6. This action arises under 31 U.S.C. § 3729 *et seq.*, as amended in 2009; 42 U.S.C. §§ 1320a-7(b)(7) and 1320a-7a; 42 U.S.C. §§ 1320a-7b(b); and M.C.L. 400.601 *et seq.* (the "Acts"), and the common law to recover treble damages and civil penalties on behalf of the United States of America and the State of Michigan arising out of the Defendants' submission of fraudulent claims to the United States and the State of Michigan governments through the federal

Medicare and the federal and state Medicaid programs.

7. This Court has exclusive jurisdiction over actions brought under the federal False Claims Act and concurrent jurisdiction over state claims arising from the transactions giving rise to the claims under the FCA. 31 U.S.C. § 3732. In addition, jurisdiction over this action is conferred on this Court by 28 U.S.C. §§ 1345 and 1331 because this civil action arises under the laws of the United States. Further, this Court has jurisdiction, under 31 U.S.C. § 3732(b), over any action brought under the laws of any state for the recovery of funds paid by state or local government if the action arises from the same transaction or occurrence as an action brought under § 3732.

8. Venue is proper in this district pursuant to 28 U.S.C. § 1391 and § 3732(a) of the FCA, which provides that "any action under 3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant can be found, resides, transacts business, or in which any act prescribed by § 3729 occurred." The acts which are the subject of this action occurred in the federal Eastern District of Michigan, which encompasses the location of Defendants' places of business.

9. As required under § 3730(b)(2) of the FCA, Relator had provided to the Attorney General of the United States and to the United States Attorney for the Eastern District of Michigan, prior to the filing of this Complaint, statements of all material evidence and information related to the Complaint (the "Evidentiary Disclosure"). Relator has also provided the Attorney General of the State of Michigan a copy of the Evidentiary Disclosure pursuant to M.C.L. 400.610a(2).

**ORIGINAL SOURCE STATEMENT**

10. Relator is the original source of the information underlying the allegations contained in this Complaint. 31 U.S.C. § 3730(e)(4)(A), (B); M.C.L. 400.610a(13).

**PARTIES**

11. Relator Michael Noble (hereafter "Relator"), for all times relevant to this Complaint, is a resident of Fort Gratiot, Michigan, located in the Eastern District of Michigan and for all times relevant to this Complaint was employed as a Certified Occupational Therapist Assistant (COTA) initially for Defendant CIENA HEALTH CARE MANAGEMENT, INC. and REGENCY ON THE LAKE FORT GRATIOT, LLC and then for SELECT PHYSICAL THERAPY, INC.

12. Defendant CIENA HEALTH CARE MANAGEMENT, INC. (hereafter "Ciena") is a Michigan corporation with its principal place of business located in Southfield, Michigan and for all times relevant to this Complaint is doing business in the Eastern District of Michigan.

13. Defendant REGENCY ON THE LAKE-FORT GRATIOT, LLC, d/b/a REGENCY ON THE LAKE-FORT GRATIOT is a Michigan limited liability company with its principal place of business located in Southfield, Michigan and for all times relevant to this Complaint is doing business in the Eastern District of Michigan.

14. Defendant REGENCY ON THE LAKE REAL ESTATE-FORT GRATIOT, LLC, is a Michigan limited liability company, with its principal place of business located in Southfield, Michigan and for all times relevant to this Complaint is doing business in the Eastern District of Michigan.

15. Defendant MOHAMMAD A. QAZI, is for all times relevant to this Complaint the owner of Defendants Ciena, Regency on the Lake-Fort Gratiot, LLC and Regency on the Lake Real Estate-Fort Gratiot, LLC with its principal place of business located in Southfield, Michigan and for all times relevant to this Complaint is a resident in the Eastern District of Michigan.

16. SELECT REHABILITATION MANAGEMENT SERVICES (hereafter SELECT) is for all times relevant to this Complaint a Delaware Corporation doing business in the Eastern District of Michigan.

## **GENERAL ALLEGATIONS**

17. Medicare and Medicaid are separate federally funded health care programs established by Congress in 1965 as Title XVIII and XIX, respectively, of the Social Security Act. 42 U.S.C. § 1395, *et seq*., and § 1396, *et seq*.

18. Medicare is administered by the United States Department of Health and Human Services (DHHS) and two of its agencies, the Centers for Medicare and Medicaid Services (CMS) (previously the Health Care Financing Administration) and the Social Security Administration (SSA).

19. Medicare is available to individuals aged 65 and older, individuals younger than 65 who qualify for Social Security disability benefits and have been disabled for 2 years or more, and individuals suffering from End Stage Renal Disease or Lou Gehrig's Disease.

20. Medicare is an insurance program comprised of four parts, including three affected here: Medicare Part A, or "Hospital Insurance," provides coverage for inpatient hospitalization, limited nursing care, home health care, and hospice services and is funded

through payroll taxes and the benefits are free; Medicare Part B, or "Medical Insurance," is supplemental medical insurance that provides coverage for outpatient hospital visits, physician services, durable medical equipment (DME), diagnostic tests, and prescription drugs administered by a physician and is a voluntary program that requires a beneficiary to pay monthly premiums along with a deductible and a 20% co-insurance payment for most services; and Medicare Part C, or the Medicare Advantage Program, provides the benefits of Parts A and B through private managed care plans.

21. Medicaid is a health care program jointly funded by the federal and state governments to supply medical assistance to low-income individuals and families.

22. Medicaid programs are established by each state pursuant to guidelines provided by the federal government.

23. Each state administers its own Medicaid program, but the federal Centers for Medicaid and State Operations, a division of CMS, monitors each state program.

24. States must provide Medicaid to the "categorically needy," including beneficiaries of Aid for Dependent Children (AFDC), recipients of Supplemental Security Income (SSI), low-income pregnant women, and children with a family income at, or slightly above, the federally-defined poverty level.

25. Some states, including Michigan, also provide Medicaid benefits to the "medically needy," that may include students, individuals aged 65 or older, blind persons, and disabled persons.

26. Federal guidelines require every state Medicaid program to provide the following benefits, among others: (1) inpatient hospital services, (2) outpatient hospital services, (3)

laboratory and x-ray services, (4) physicians' services, (5) home health services, and (6) certain ambulatory services. *See* 42 C.F.R. §§ 440.210-220.

27. Pursuant to the Medicare Benefit Policy Manual Chapter 8 - Coverage of Extended Care (SNF) Services 70.3 - Inpatient Physical Therapy, Occupational Therapy, and Speech-Language Pathology Services (Rev. 37, Issued: 08-12-05; Effective/Implementation: 09-12-05). Under Part A, physical therapy, occupational therapy, and speech pathology services are included in the Skilled Nursing Facility (SNF) prospective payment system (PPS) rate for cost reporting periods. For inpatient Part B residents and outpatient services, payment for such services is under a fee schedule.

28. The SNF must bill for physical therapy, occupational therapy, or speech-language pathology services for Part A residents beginning with its first cost reporting period that occurred on or after July 1, 1998, and for Part B for services furnished on or after July 1, 1998. The SNF (rather than an outside provider/supplier such as an approved clinic or rehabilitation agency, or a participating hospital) bills Medicare. Payment is made directly to the SNF. The patient is responsible only for applicable Part A coinsurance or the Part B deductible and coinsurance amounts.

29. Skilled physical therapy services must meet all of the following conditions:

a. The services must be directly and specifically related to an active written treatment plan that is based upon an initial evaluation performed by a qualified physical therapist after admission to the SNF and prior to the start of physical therapy services in the SNF that is approved by the physician after any needed consultation with the qualified physical therapist. In cases where a beneficiary is discharged during the SNF stay and later readmitted, an initial evaluation must be performed upon readmission to the SNF, prior to the start of physical therapy services in the SNF;

b. The services must be of a level of complexity and sophistication, or the condition of the patient must be of a nature that requires the judgment, knowledge, and skills of a qualified physical therapist;

c. The services must be provided with the expectation, based on the assessment made by the physician of the patient's restoration potential, that the condition of the patient will improve materially in a reasonable and generally predictable period of time, or the services must be necessary for the establishment of a safe and effective maintenance program;

d. The services must be considered under accepted standards of medical practice to be specific and effective treatment for the patient's condition; and,

e. The services must be reasonable and necessary for the treatment of the patient's condition; this includes the requirement that the amount, frequency, and duration of the services must be reasonable.

30. Some of the more common skilled physical therapy modalities and procedures are:

a. Assessment;

b. Therapeutic Exercises;

c. Gait Training;

d. Range of Motion;

e. Maintenance Therapy;

f. Ultrasound, Shortwave, and Microwave Diathermy Treatments; and

g. Hot Packs, Infra-Red Treatments, Paraffin Baths, and Whirlpool Baths.

31. On or about March 17, 2007, Relator commenced his employment with Defendants Ciena and Regency on the Lake-Fort Gratiot an SNF, in the capacity of a Certified Occupational Therapist Assistant (COTA), reporting to Jeri Pemberton, the Rehabilitation Manager.

32. On or about September 2009, Defendants Ciena and Regency on the Lake-Fort Gratiot entered into an agreement with Defendant Select to provide occupational therapy (OT), physical therapy (PT) and speech and language therapy (SL) for the residents of Regency on the Lake-Fort Gratiot.

33. On or about the late summer of 2009 Relator learned from Defendant Qazi that he had met with representatives of Defendant SELECT in Chicago.

34. On or about the late summer of 2009 Defendant Qazi reported to Defendant Regency staff, including Relator, that Ciena and Regency had enter into an agreement with Select to allow it to provide the OT, PT and SL and that Ciena/Regency would split monies paid for the therapy minutes charged to Medicare and/or Medicaid.

35. On or about September 2009, Relator became an employee of Defendant Select in the capacity of a COTA.

36. Relator's work duties, location of work and the reporting structure remained the same after he became an employee of Defendant SELECT.

37. Jeri Pemberton, Defendant Ciena's and Defendant Select's former Rehabilitation Manager, used the following terms as a shorthand to describe the number of minutes assigned for the therapy provided as follows:

a. *Ultra* for 700 minutes on a weekly basis;

b. *Very high* for 500 minutes on a weekly basis;

c. *High* for 400-500 minutes on a weekly basis; and

d. *Low* anything below 400 minutes on a weekly basis.

38. Relator observed that the level of therapy services provided to any patient was rarely "low" and typically the minutes were in the "very high" to "ultra" categories.

39. Ms. Pemberton maintained a large cork bulletin board located in the rehabilitation office located within Regency's therapy department, where she posted, on a daily basis, the amount of therapy minutes each patient was scheduled to receive on that day.

40. RUG, a Medicare term, stands for "Resource Utilization Group."

41. The RUG units are used to calculate the amount of therapy units billed to Medicare. By way of example, 8-15 minutes of PT is equal to 1 RUG billed; 16-22 minutes of PT is equal to 2 RUGs billed, etc.

42. RUG "ultra" and "very high" minutes were posted in red on Ms. Pemberton's bulletin board, to put therapists, like Relator, on notice that the patients' total minutes for the billing period were close to the "ultra" or "very high" figures.

43. If a patient was too ill or away from Regency due to short-term (under 24 hours) hospital or doctor visit and thus could not participate in therapy, therapists were required to ensure that the therapy minutes were made up upon the patient's return to the facility.

44. During Relator's tenure, Janine Denomme, OT, Ashook Gurmani, PT and Gregory Garffarlo, PT performed the OT and PT evaluations, respectively, for Defendants.

45. From on or about September 2009 to April 2010, on several occasions, Messrs. Guramani and Garffarlo informed Relator that Ms. Pemberton, on behalf of the Defendants, forced them to conclude that patients needed the highest (Ultra) number of minutes for physical therapy, that they were pressured to fabricate the amount of services needed, pressured to fabricate the length of services needed and to use "creative writing" to support their therapy

recommendations.

46. On several occasions and as recently as April 2010, Mr. Gurmani threatened to resign in the presence of Relator over Defendants' illegal billing practices.

47. On several occasions, from on or about 2007 until Relator's last date of work, Ms. Denomme told Relator that several patients did not need therapy, but Ms. Pemberton required her to pick them up for therapy.

48. On or about March 2007 until at least Relator's last date of work, Ms. Pemberton, instructed therapists not to discharge patients stating "Just keep them two more weeks," and implemented a policy that prior to a patient being discharged from care, two people had to evaluate whether the discharge was appropriate. The addition of a second person to conduct the discharge review resulted in patients being delayed from discharge.

49. On virtually every Wednesday, from on or about 9:00 a.m. to 10:30 a.m. or 11:30 a.m. to 12:30 p.m. Defendant Ciena's employee Dr. Filomeno conducted a weekly *Medicare* meeting in Regency's Activities Room.

50. Dr. Filomeno**,** Katherine Laverance, Regency's Administrator, Jeri Pemberton, nurse supervisors, nurses, all therapists and therapy assistants attended the weekly *Medicare* meetings.

51. Dr. Filomeno led the weekly meetings and often questioned the validity of the patients' need for therapy and asked why specific patients were still receiving therapy.

52. The meetings often focused on the entity's census and the staff was told that census drives admissions and discharges.

53. Relator heard Ms. Laverance state during several weekly meetings that the entity

was going to be empty if they discharged people and threatened that staff will have to go and find other jobs. She also repeatedly asked if the patients were really ready to go home.

54. During Relator's tenure Defendant Ciena's Regency site had nine therapists: two PTs, two PTAs, one OTR and three COTAs, one SL and one Social Worker. There were also medical data systems personnel on staff.

55. During the course of Relator's employment with Ciena and Select, he observed conduct that led to false billing in the following ways:

a. Throughout this tenure, Relator often heard Ms. Pemberton tell him and other therapists to keep the beds filled. "If the census is low, Kathy [Laverance] will have to cut staff."

b. Throughout his tenure, Relator observed that Ms. Pemberton required therapists to provide therapy services to ineligible or unqualified patients due to severe dementia or severe mental health issues, creating an inability to participate.

c. Despite Relator's decision to discharge a patient who no longer qualified for therapy, Ms. Pemberton would override the discharge and reassign Relator's patient to Ms. Darci Smith, COTA or another therapist to prevent the discharge. By way of example: On or about January, 2010 through on or about March, 2010, Patient TW was originally assigned to Ms. Smith for therapy for four weeks. At the conclusion of the fourth week of therapy, Ms. Smith stated she made no progress with TW whereupon he was transferred to Relator's caseload. Relator provided TW with an additional four weeks of therapy and after TW made no progress he attempted to discharge him. Ms. Pemberton blocked the discharge and TW was returned to Ms. Smith's caseload for another four weeks.

d. On or about late March, 2010, Ms. Pemberton insisted that Mrs. A, 98 years old and very ill, receive on average 70 minutes of PT and 70 minutes of OT on a daily basis.

e. Ms. Pemberton insisted that Mrs. S, who was initially on Relator's caseload and who was not appropriate for PT or OT receive 70 minutes of PT and 70 minutes of OT on a daily basis. Relator discharged Mrs. S, but Mr. Greg Garffarlo, PT continued her on therapy. On or about February and March, 2010, Relator witnessed Mrs. S sleeping in her wheelchair

during the time period billed for therapy.

f. On or about March, 2010, Ms. Smith provided TW with therapy in his room which was improper. This therapy was illegally billed. This type of billing was referred to internally as "Basu Billing." Basu is a former employee who falsely billed.

g. On or about mid March, 2010, Chuck Ernst, PTA, in the presence of Relator, falsely billed for "room treatment" PT services provided to Ms. A, who was recovering from a fractured hip.

h. In April, 2010, PM was frequently left in his bed for hours on end, often found lying in his feces. PM was able to ambulate short distances, up to ten feet on the parallel bars. PM was receiving 70 minutes of PT and 70 minutes of OT daily despite his opposition to this amount of PT. Finally, Ms. Pemberton reduced his therapy minutes to 50 minutes daily for PT and 50 minutes for OT. PM was a large man and difficult to transfer. Often he received "room treatment" for ten minutes but Defendants falsely billed 50 to 70 minutes of PT and OT.

i. On or about March, 2010, Mr. B, who has a rotated hip and thus his gait was not treatable, was not appropriate for PT and OT therapies. Nevertheless, Mr. Garfflarlo, PT continued Mr. B in unnecessary therapy to delay discharge to allow his family to build a wheelchair ramp at home.

j. In fall 2008, Ms. DA was ambulatory and doing well. However, PT ordered her to be confined to a wheelchair.

k. Ms. NG was ambulatory and was inappropriately admitted to the facility and was provided unnecessary OT on or about December, 2009.

l. On or about March or April 2010, Relator observed that Defendants recorded that PT services were provided to a patient named Ms. K.S., who was approximately 97 years old and was asleep in the corner of the room at the time she allegedly received PT.

m. Throughout Relator's tenure with Defendants, he observed Defendants creating and implementing a plan to ensure that therapists and therapy assistants reached the "Ultra" level as defined by billing 700 minutes combined OT and PT per patient per week irrespective of the patients' needs.

n. Throughout his tenure, Relator observed that the vast majority of Defendants' patients received 700 minutes of OT and PT combined per

week.

o. On or about November, 2008, and dates thereafter, Relator and others were instructed to increase Medicare B cases because per Ms. Pemberton, Medicare B pays "good money" and that staff should try to pick up at least two "Med Bs" per week. When therapy caseloads were too low, Defendants instructed Relator, and other therapists, to go to the facility's long-term care population and pick up "Med Bs" for evaluation and pre-determined services.

p. Throughout his tenure, Relator observed the facility discharging patients prior to the expiration of 100 days and then readmitting them under Medicare B and requiring family members to pay the co-pay.

q. Relator observed staff billing for 45 minutes of ADL when the staff actually dressed the patient.

r. Throughout Relator's tenure, he observed Defendants illegally billing Medicare or Medicaid for toileting of patients as therapy when it is neither PT nor OT.

s. Illegally billing Medicare or Medicaid for showering a patient without patient participation as an Activity of Daily Living when it is not.

t. Providing OT for terminal patients, such as Mr. T.A. in approximately February, 2010 and Mr. O. in approximately February, 2010, when they both should have been in hospice.

u. On or about December, 2009 through April, 2010, providing patient Ms. S.R., who was medically unstable, with 75 minutes of PT per day.

v. Throughout Relator's tenure, he observed Defendants requiring staff to note therapy services were provided even when the patient remained in bed or did not participate in the therapy.

w. From at least on or about March, 2009 through April, 2010, falsely charging Medicare and/or Medicaid for individual (one-on-one) physical therapy when the physical therapy was actually provided in group therapy sessions.

x. Throughout Relator's tenure, he observed that OT and PT staff continued to provide PT and OT services to patients even though the patients had reached a plateau and thus additional therapies were unnecessary.

y. Throughout his tenure, Relator observed Defendants charging for therapy in patient's rooms for 60 minutes or more, when room therapy is not a chargeable treatment and no therapist remained in any patient's room for 60 minutes or more.

z. Relator observed Lori Wright, PTA falsify billing, retaining patients on her caseload too long and performing ADLs outside the scope of her practice.

aa. Engaging in illegal splitting of monies paid for therapy minutes in the following manner:

i. PTs, OTs and SL maintained daily timesheets reflecting the minutes provided per patient per day.

ii. At the end of each week day, the therapists' timesheets were faxed by Ms. Pemberton to the accounting department of Defendant Select's Chicago, IL office for processing.

iii. Ms. Pemberton and Mr. Gurmani informed Relator that Defendants Ciena and Select have a five year agreement to split the money for therapy minutes billed and paid and half of the money is paid to Defendant Ciena and the other of half of the money is paid to Defendant Select. Pemberton also told Relator that this contract extended to all of Defendant Qazi's treatment facilities.

56. During Relator's tenure with Regency, he observed that Regency has 108 beds, and approximately 30-35 patients were billed for skilled therapy on any given day of the week.

57. On or about April 20, 2010, Relator reported to work.

58. On or about April 20, 2010, Relator informed Ms. Pemberton that he could no longer tolerate the illegal billing practices.

59. On or about April 20, 2010, Relator went on medical leave of absence from work.

60. On or about May 20, 2010, Relator resigned from Defendant Select.

## COUNT I
## FALSE CLAIMS ACT – CONSPIRACY

61. Relator incorporates by reference Paragraphs 1 though 60 of this Complaint.

62. Defendants, together with their employees and other persons or entities known or unknown, conspired to defraud the United States and the State of Michigan governments by agreeing to present false or fraudulent claims for payment or approval by the United States and the State of Michigan governments as detailed in paragraphs 32 through 56 inclusive above which claims were false or fraudulent by virtue of Defendants' certification, or implied certification, to the United States government and the State of Michigan that Defendant was in compliance with the Medicare and Medicaid laws, the CMPL, and other federal and state health care laws.

63. The United States government and the State of Michigan were unaware of Defendants' improper and illegal conduct and made full payment on or approved the false or fraudulent claims, which resulted in damage in an amount to be determined.

## COUNT II
## FALSE CLAIMS ACT – PRESENTATION OF FALSE CLAIMS

64. Relator incorporates by reference Paragraphs 1 though 63 of this Complaint.

65. Defendants knowingly presented or caused to be presented to the United States and State of Michigan governments false or fraudulent claims for payment or approval as detailed in paragraphs 32 through 56 inclusive above which claims were false or fraudulent by virtue of Defendants' certification, or implied certification, to the United States and State of Michigan governments that Defendant was in compliance with the Medicare and Medicaid laws, the CMPL, and other federal and state health care laws.

66. The United States government and the State of Michigan were unaware of Defendants' improper and illegal conduct and made full payment on or approved the false or fraudulent claims, which resulted in damage in an amount to be determined.

**COUNT III**
**FALSE CLAIMS ACT – FALSE RECORD OR STATEMENT**

67. Relator incorporates by reference Paragraphs 1 though 66 of this Complaint.

68. Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States and State of Michigan governments as detailed in paragraphs 32 through 56 inclusive above, which claims were false or fraudulent by virtue of Defendants' violation certification, or implied certification, to the United States and State of Michigan governments that Defendant was in compliance with the Medicare and Medicaid laws, the CMPL, and other federal and state health care laws.

69. The United States government and the State of Michigan were unaware of Defendants' improper and illegal conduct and made full payment on or approved the false or fraudulent claims, which resulted in damage in an amount to be determined.

**PRAYER FOR RELIEF**

WHEREFORE, Relator, on behalf of himself and of the United States and the State of Michigan, requests judgment as follows:

A. The United States and the State of Michigan are entitled to reimbursement of the funds obtained by Defendants as a result of fraudulent claims submitted to the United States and the State of Michigan.

B. The United States is entitled to a civil penalty of $5,500 to $11,000, adjusted for inflation, for each false or fraudulent claim plus 3 times the damages sustained by the United States as a result of the false or fraudulent claim. *See* 31 U.S.C. § 3729(a); 28 C.F.R. 85.3(a)(9).

C. The United States is entitled to a civil monetary penalty of $10,000 to $50,000 for each violation of the CMPL, plus an assessment of not more than 3 times the amount of each false or fraudulent claim without regard to damages actually sustained by the United States. *See* 42 U.S.C. § 1320a-7a(a).

D. The United States is entitled to exclude Defendants from participation in any federal health care program. *See* 42 U.S.C. § 1320a-7(b)(7).

E. Relator is entitled to an amount for reasonable expenses necessarily incurred, plus reasonable attorneys' fees and costs. *See* 31 U.S.C. § 3730(d).

F. Relator is entitled to an order of partial distribution of the damages, penalties, assessments, and other relief awarded to the United States in an amount equivalent to a percentage of the entire recovery as set forth in 31 U.S.C. § 3730(d); such percentage distribution is in addition to Relator's recovery of expenses, attorneys' fees, and costs.

## DEMAND FOR TRIAL BY JURY

NOW COMES Relator, Michael Noble, on behalf of himself and the United States of America and the State of Michigan, by and through his attorneys, HERTZ SCHRAM PC, and hereby demands a jury trial in the above-captioned matter.

Respectfully submitted,

HERTZ SCHRAM PC
Attorneys for Plaintiff-Relator

By: s/ Patricia A. Stamler
1760 S. Telegraph Road, Suite 300
Bloomfield Hills, MI 48302-0183
(248) 335-5000
Email: pstamler@hertzschram.com
Bar Number: P35905

Dated: October 1, 2010